**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

**UNITED STATES OF AMERICA**
        **Plaintiff,**

   v.                                                               **Case No. 11-CR-153**

**JOHN E. SCHMIDT, JR.**
        **Defendant.**

## DECISION AND ORDER

The government charged defendant John Schmidt with possessing a firearm as a felon, contrary to 18 U.S.C. § 922(g)(1). Defendant moved to suppress the firearm, arguing that the police violated the Fourth Amendment by entering and searching his backyard without a warrant.[1] The magistrate judge handling pre-trial proceedings in this case held an evidentiary hearing, then issue a recommendation that the motion be denied. Specifically, the magistrate judge found that defendant lacked a reasonable expectation of privacy in the yard, which he shared with several others, including the residents of another house sitting on the back of the lot.

Defendant objects to the recommendation, requiring me to review the matter de novo. See Fed. R. Crim. P. 59(b). Neither side requests a de novo evidentiary hearing, and I find the record made before the magistrate judge sufficient for me to rule on the motion. See United States v. Raddatz, 447 U.S. 667, 673 (1980) (holding that de novo review does not require a de novo evidentiary hearing). For the reasons set forth below, I agree with the magistrate

---

[1]Defendant also moved to suppress his post-arrest statement as fruit of the illegal search and based on the delay in bringing him before a magistrate. He has since abandoned the latter contention.

judge that, under the particular circumstances of this case, defendant lacked a reasonable expectation of privacy in the area searched by the police.

## I. FACTS

On May 30, 2011, at approximately 10:30 p.m., City of Milwaukee Police Officer Tommy Wilson and his partner, while responding to a call at 1034 W. Greenfield Avenue in Milwaukee, heard approximately eleven gunshots. (R. 11 [Stipulation of Facts] at 1.) Wilson and his partner exited their squad to investigate, walked a short distance to S. 10th Street, and saw four people exit the yard at 1420/1422 S. 10th Street, an upper/lower duplex sitting on the front of the lot. Another duplex, with the address of 1424/1426 S. 10th Street, sits on the back of this lot. The yard is shared by both houses. (R. 11 at 1-2; R. 16 [Evid. Hr'g Tr.] at 3-4, 21.)[2] Defendant resides in the lower unit of the front duplex (1422 S. 10th Street), which he had been renting for several months prior to this incident. (R. 11 at 1; R. 16 at 61.)

Wilson stopped to talk with the people leaving the yard, but before they could respond the officers heard more gunshots from an area southwest of their location, and Wilson fired his rifle once in response. (R. 11 at 2; R. 16 at 11-12.) Additional officers arrived to assist in the shooting investigation, and between 11:11 p.m. and 11:43 p.m. officers dispatched to St. Luke's Medical Center made contact with an individual who just had been shot in the alley near 10th and Orchard streets, the area where Wilson and his partner heard shots fired. The officers relayed this information to their comrades on the scene. (R. 11 at 2.)

---

[2]At the evidentiary hearing, the parties submitted several photographs of the scene. Exhibit 2 depicts the front duplex, 1420/1422 S. 10th Street (R. 16 at 19); exhibits 3 and 4 depict the alley behind the lot, between S. 9th and 10th Streets (R. 16 at 33-34); and exhibit 5 depicts the lot as viewed from the alley, showing the rear of 1420/1422 and the side of 1424/1426 (R. 16 at 19-20).

2

At the evidentiary hearing, the government presented a diagram of the scene of the shootings, which covered the block of W. Orchard Street between S. 10th and S. 9th Streets and the alley running behind S. 10th and S. 9th Streets between W. Orchard Street (to the south) and W. Greenfield Avenue (to the north). (Ex. 1.) Given the size of the crime scene, approximately twenty officers arrived to assist in the investigation, and they located fifty items of evidentiary value, including over thirty spent casings from four different caliber weapons. (R. 16 at 8-9, 12-13; Ex. 1.)[3] Officers also located a .40 caliber handgun and a knife in the backyard of the house on the southeast corner of S. 10th and W. Orchard Streets, and a black machete or sword from the backyard of 1444 S. 10th Street.[4] (R. 16 at 14-15.) Officers further discovered that a car parked on the slab behind 1420/1422 S. 10th Street (defendant's building) had been struck by bullets, as had 1424/1426 S. 10th Street (the rear duplex on the shared lot). (R. 11 at 2; R. 16 at 21-22.) Officers found five or six shell casings nearby. (R. 16 at 17-18, 23.)[5]

At 11:30 or 11:45 p.m., Officer Gregory Borst made contact with a resident of the upper unit of the front duplex (1420 S. 10th Street), an adult female who lived there with her two sons. (R. 16 at 52, 54.) She reported that at about 10:00 p.m. she heard shots, people running through the shared yard, and then a second set of gunshots. (R. 11 at 2.)

At approximately 1:00 a.m., Officer Jonathan Caya entered and searched the shared

---

[3]The diagram, exhibit 1, marks where items of evidentiary value were located.

[4]Exhibit 12 is a photograph of the sword and exhibit 13 a photo of the handgun. (R. 16 at 34-35.)

[5]Exhibit 5 depicts the car parked on the slab, exhibit 6 depicts the casings found next to the car, and exhibit 7 depicts the bullet holes in 1424/1426 S. 10th Street. (R. 16 at 24-25.)

3

yard of 1420/1422 and 1424/1426 S. 10th Street. (R. 11 at 3.) A chain-link fence with a "No Trespassing" sign separates the yard from the alley.[6] (R. 16 at 20, 36-37.) The fence gate has a padlock on it, which, according to the resident of the upper unit of the duplex, is typically locked because of problems with gang members running through the yard. (R. 16 at 53, 58.) However, on this night, the gate was unlocked and open.[7] (R. 16 at 26-27, 38, 47.) An additional .380 caliber shell casing was found inside the chain-link fence.[8] In the northwest corner of the yard, about twenty-five or thirty feet from the chain-link fence, near the front duplex, Caya observed a pile of debris including an old bicycle, wood, a blue plastic container lid, a garden hose, and other trash. (R. 16 at 39-40.) Caya scanned the pile with his flashlight and something metallic caught his eye; on closer inspection, he saw what appeared to be a firearm scope. Caya lifted the plastic lid and observed what appeared to be the stock of a large bore rifle. Caya then pushed the grass aside and observed a .308 Winchester, the same type of rifle he uses to hunt.[9] This firearm forms the basis for the instant indictment. (R. 11 at 3;

---

[6]Exhibit 5 depicts the fence and gate viewed from the alley.

[7]Caya testified that he did not know who may have opened the gate or when it was opened. He indicated that he was not the first officer in his group to arrive, and there were other officers in the area around the car. However, he did not observe other officers in the yard at that time. (R. 16 at 49-50.) Borst testified that the resident of the upper unit told him that she believed she locked the gate on the night in question, "[b]ut when we went to the back gate it was found open. I believe she stated something to the fact that she must have forgotten to lock it." (R. 16 at 53.)

[8]Exhibit 8 depicts the casing found inside the yard. (R. 16 at 25.)

[9]Exhibit 9 depicts the pile of debris from a vantage point towards the back of the lot; exhibit 10 is a close-up of the bicycle; and exhibit 11 is a close up of the pile of debris, including the rifle. (R. 16 at 27-29.) Caya testified that when he first approached the pile, the blue plastic lid depicted in exhibit 11 covered the stock of the firearm. Exhibit 11 thus depicts the rifle after Caya moved the lid. Caya did not otherwise move or manipulate the firearm. (R. 16 at 30-31.)

R. 16 at 27-29.)

Caya testified that he was in the yard for five or ten minutes before he discovered the rifle. (R. 16 at 31-32.) He further testified that the bicycle could be seen from the alley outside the fence, but he did not see it before entering the yard. (R. 16 at 32.) He could not see the rifle from the rear gate. (R. 16 at 44.) Caya admitted that the police did not obtain a warrant to enter the yard, and that in Milwaukee a telephone warrant can be obtained. (R. 16 at 43.) He explained that his intent in entering the yard was to make sure nobody was injured and to look for evidence. (R. 16 at 43-44.)

Officer Caya identified – and the photographic exhibits depict – three entrances to the rear duplex on the subject lot. The front entrance, shown in exhibit 2, lies on the west side of the house. If one used this entrance, one would necessarily have to walk through the shared yard. Another entrance, shown in exhibits 5 and 8, lies on the north side of the house, just inside the chain link fence; if one used this entrance, one would also have to enter the yard. The third entrance, shown in exhibit 3, lies on the east side of the property and appears to be directly accessible from the alley (outside the fence). (See R. 16 at 47-48.)[10]

Defendant testified that on May 30, 2011, he lived in the lower unit of the 1420/1422 duplex with his sister and little brother. (R. 16 at 61.) His girlfriend and her mother lived in the upper unit. (R. 16 at 62.) Approximately three or four people lived in the building on the back of the lot; he knew them only by face. (R. 16 at 62-63.) Defendant testified that only the tenants and the landlord had access to the yard shared by these two duplexes. (R. 16 at 64.)

---

[10] In defendant's objections and the government's response, the parties dispute the number and location of the entrances to the rear duplex. As indicated in the text, there are three doors to this house, one of which opens outside the fenced yard.

5

He indicated that he used the fenced backyard for barbecues, to relax, and to store things. (R. 16 at 64.) He stated that he stored things on the north side of the yard because it was more secluded, could not be seen from the front, was hard to see from the alley when cars were parked there, and was next to a window in his residence.[11] (R. 16 at 64-66.) Defendant testified that the chain link fence in the back of the property was put up about two weeks prior to this incident for the purpose of keeping people out of the yard. A lock was placed on the gate and only the tenants were given keys. (R. 16 at 65.) Defendant testified that he did not expect other tenants or law enforcement to go through the things he kept in the backyard. (R. 16 at 66.)

## II. DISCUSSION

In order to succeed in his Fourth Amendment challenge, defendant must as an initial matter demonstrate a legitimate expectation of privacy in the backyard of this shared lot. See United States v. Mendoza, 438 F.3d 792, 795 (7th Cir. 2006). This is so because a "search" within the meaning of the Fourth Amendment occurs only when governmental action infringes upon an individual's legitimate expectation of privacy. See, e.g., United States v. Curlin, 638 F.3d 562, 565 (7th Cir. 2011); United States v. Ruth, 65 F.3d 599, 604 (7th Cir. 1995). A legitimate expectation of privacy exists when (1) the claimant exhibits an actual (subjective) expectation of privacy, and (2) the expectation is one that society is prepared to recognize as reasonable. United States v. Villegas, 495 F.3d 761, 767 (7th Cir. 2007); United States v.

---

[11] As indicated in exhibit 9 (taken from inside the yard facing the front of the lot, i.e. west) and exhibit 14 (taken from 10th Street looking in, i.e. facing east), a roughly six foot high wooden privacy fence covers this portion of the yard at the front of the lot. This wooden fence lies to the left of the house as depicted in exhibit 2. It also contains a no trespassing sign. (R. 16 at 21, 37-38.) Running east/west along the north edge of the property there is a shorter wooden fence separating this lot from the neighboring property. (R. 16 at 39.)

6

French, 291 F.3d 945, 951 (7th Cir. 2002).

Expectations of privacy are strongest with regard to private dwellings, and warrantless searches inside the home are thus considered presumptively unreasonable. See Payton v. New York, 445 U.S. 573, 586 (1980). Fourth Amendment protection extends beyond the four walls of the house to the "curtilage" – that "area outside the home itself but so close to and intimately connected with the home and the activities that normally go on there that it can reasonably be considered part of the home." French, 291 F.3d at 951 (internal quote marks omitted). Whether an area falls within a home's curtilage depends on the proximity of the area to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by. United States v. Dunn, 480 U.S. 294, 301 (1987).

On consideration of the Dunn factors, the magistrate judge concluded that the firearm was found within the curtilage of the duplex (R. 20 at 7), a finding to which neither side objects. As the magistrate judge noted, however, this does not end the analysis. Even if the area searched or item seized fell within the curtilage, the defendant must still demonstrate a legitimate expectation of privacy. See United States v. Shanks, 97 F.3d 977, 979-80 (7th Cir. 1996); see also United States v. Evans, 27 F.3d 1219, 1228-29 (7th Cir. 1994).

Although this inquiry is highly fact-dependent, courts have generally concluded that "shared" or "common" areas in multi-unit dwellings, such as hallways, entryways, and basements, are not areas over which an individual tenant can have a reasonable expectation of privacy. United States v. Maestas, 639 F.3d 1032, 1038 (10th Cir. 2011) (collecting cases); see, e.g., Villegas, 495 F.3d at 768 (finding no reasonable expectation of privacy in a common hallway); United States v. Concepcion, 942 F.2d 1170, 1172 (7th Cir. 1991) (holding that

tenants have no reasonable expectation of privacy in the common areas of an apartment building). This is so because, even though a defendant may harbor a subjective expectation of privacy in such an area, the expectation is not reasonable when other tenants also have access and may admit strangers to the area. United States v. Jefferson, No. 09-CR-18, 2010 WL 1186279, at *3 (E.D. Wis. Mar. 22, 2010) (citing United States v. Nettles, 175 F. Supp. 2d 1089, 1094 (N.D. Ill. 2001)); see also United States v. Espinoza, 256 F.3d 718, 723 (7th Cir. 2001). The cases in which courts have varied from this general rule typically involve buildings occupied by a limited number of tenants, such as a small, two-family house inhabited only by relatives. E.g., United States v. King, 227 F.3d 732, 747-50 (6th Cir. 2000).

Under the particular facts of this case, defendant lacked a reasonable expectation of privacy.[12] First, he shared the backyard, not just with his girlfriend's family in the upper unit of his duplex, but also with the residents of the rear duplex, whom he barely knew. These individuals could all access the yard, including the pile of debris in which defendant ostensibly decided to store a firearm.

Second, although it may be possible to access the rear duplex without entering the backyard (i.e., by using the door on the east side off the alley), any visitors to that residence wishing to use the front (west) or side (north) doors would have to traverse the enclosed yard. See United States v. Tolar, 268 F.3d 530, 532 (7th Cir. 2001) ("[C]ourts do not exclude evidence just because police reach a suspect's door by cutting across the yard (trampling on the rhododendrons in the process) rather than using the pathway, or because they enter a home's curtilage to seize garbage in which there is no privacy interest."). This would include

---

[12] I will assume that defendant's testimony established his subjective expectation of privacy. See United States v. Mitchell, 64 F.3d 1105, 1110 (7th Cir. 1995).

8

deliverymen, salesmen, or solicitors (as well as the police).  See Villegas, 495 F.3d at 768 n.3 ("[A]ny visitor to either unit, including delivery persons, solicitors and customers of [the other tenant's] business, would pass through the common hallway to reach either unit.").[13]

Third, while a six foot privacy fence covered the northwest portion of the yard, the entirety of the yard could be viewed through the chain link fence by anyone walking through the alley.  Further, on the evening in question, the gate to that fence had been left open, apparently by the upper tenant in defendant's building.[14]  See Tolar, 268 F.3d at 532 ("An open gate invites entry, and a chain-link fence does little to assert a privacy interest (as opposed to a property interest) in details visible from outside the fence.").  It is true that a person standing outside the fence could not have seen the firearm, but the bicycle was visible from the alley.[15]

Finally, while the specific portion of the yard in which Office Caya found the gun was somewhat more secluded (and fell on the opposite side of the yard from the walkway to the rear duplex), it also appears to be an area where residents dumped things like rusty old bikes, empty window frames, pieces of wood, and stray plastic lids.  The debris was not set out for collection – so the "garbage search" cases are not directly applicable, see, e.g., United States v. Redmon, 138 F.3d 1109 (7th Cir. 1998) – but it is nevertheless hard to consider reasonable

---

[13]In his objections, defendant argues that the magistrate judge erred in finding that the rear duplex was accessible only through the yard.  As discussed above, there is a way to get into the rear building without entering the yard; nevertheless, it does appear that most visitors to the building, including those wishing to use the front door, would proceed through the yard.

[14]The fact that another tenant could leave the gate open, thus exposing the yard to others, points up the reduced expectation of privacy one has in such shared spaces.

[15]It is also true that the landlord posted no trespassing signs, but "a trespass is neither necessary nor sufficient for constitutional purposes." Tolar, 268 F.3d at 532.

9

an expectation of privacy in a pile of trash.[16]

As noted, the expectation of privacy inquiry is highly fact-specific, making other cases of somewhat limited value. Nevertheless, it is worth noting that courts have generally found no reasonable expectation of privacy in shared backyards. See, e.g., United States v. Acosta, 965 F.2d 1248, 1256-57 (3d Cir. 1992); Sanchez v. City of Los Angeles, No. CV 09-8920, 2010 WL 2569049, at *13 (C.D. Cal. May 26, 2010), adopted, 2010 WL 2572615 (C.D. Cal. Jun. 18, 2010); United States v. Butler, No. 06-CR-215, 2007 WL 2220260, at *7 (E.D. Wis. Aug. 1, 2007) (Stadtmueller, J.); see also United States v. Brooks, 645 F.3d 971, 975 (8th Cir. 2011) (finding that the backyard of a multi-unit building, surrounded by an unlocked chain-link fence, was not curtilage). The Fifth Circuit reached a contrary result in Fixel v. Wainwright, 492 F.2d 480 (5th Cir. 1974), but in that case the yard was accessible only by passing through a dwelling unit, allowing the court to distinguish the yard from common hallways used by other tenants or outsiders to access individual units. The Fixel court noted that, unlike a common hallway or entrance, the backyard was not accessible to anyone who wished to approach the building's

---

[16]In his objections, defendant disputes that this area of the yard was a trash repository. He notes that there was no testimony regarding whether this pile of items was trash, a collection of scrap for household projects, or goods that tenants intended to use or sell; some of the items, such as the hose and bike, are common to a backyard. However, the photographs, particularly exhibit 11, support the characterization of this part of the yard as a dumping ground rather than some sort of storage area. Defendant further argues that even if these items were trash, the search was still unreasonable, as officers may not enter areas they would not otherwise be allowed to enter to search trash. The cases suggest otherwise. See Shanks, 97 F.3d at 979 ("Even assuming that the garbage containers were within the curtilage of Shanks' home, Shanks cannot show that the district court's additional finding (that he did not hold a reasonable expectation of privacy in the garbage) is clearly erroneous.") (internal citation omitted); United States v. Dunkel, 900 F.2d 105, 107 (7th Cir. 1990) ("Intoning 'curtilage' does not alter the fact that the parking lot was open to all comers – not only Dunkel's invitees but also those of his seven tenants."), vacated on other grounds, 498 U.S. 1043 (1991).

tenants. Villegas, 495 F.3d at 768 n.3 (discussing Fixel). In the present case, conversely, the yard could be entered from the outside through the open back gate, and visitors to the rear duplex would likely enter and traverse the shared yard to reach their destination. See also United States v. Miravalles, 280 F.3d 1328, 1332 (11th Cir. 2002) (distinguishing Fixel on similar grounds); United States v. Porter, No. CRIM. A. 03-259, 2003 WL 22533676, at *2 (E.D. La. Nov. 5, 2003) (same).

In his objections, defendant relies heavily on Judge Rovner's concurrence in Villegas. Judge Rovner makes a strong argument that the question should not be whether the area is accessible to other residents and their guests, but instead whether the area is accessible to the public at large.[17] Villegas, 495 F.3d at 771-72 (Rovner, J., concurring). However, the Seventh Circuit appears not to have endorsed this position. See, e.g., Espinoza, 256 F.3d at 718 (noting "that tenants lack a legitimate expectation of privacy in the common areas of multi-family buildings, because landlords and co-tenants are free to admit strangers"). In any event, even under Judge Rovner's rule the result here is the same. First, the gate was open when Officer Caya entered the yard. See Villegas, 495 F.3d at 772 (Rovner, J., concurring) ("[A] police officer confronting an unlocked screen door might think that the common hallway was open to the public and, therefore, open to him as well."). Second, as discussed above, the yard was accessible to members of the public wishing to approach the front door of the rear

---

[17]Judge Rovner explains: "We do not say that cohabiting adults have no reasonable expectation of privacy in their shared residence although both have access to some if not all of the premises and either one may admit others; rather, we recognize that each has a cognizable privacy interest for Fourth Amendment purposes and that a police officer normally cannot enter without the consent of at least one resident. I discern no reason why the same principle ought not to hold vis-à-vis the secured common areas of a multi-unit residential building." Id. at 772 (internal citations omitted).

duplex on the shared lot.

Rejection of defendant's claim does not, as he suggests in his objections, mean that sharing space automatically extinguishes a person's expectation of privacy. The holding of this case is based on its specific facts, including (in addition to the shared nature of the premises): the fact that the primary walkway to the rear duplex ran through the yard, the residence of persons unconnected and essentially unknown to defendant in the rear duplex, the openness of the rear fencing on the lot, the unlocked gate, and the apparent use of the relevant portion of the yard as a repository for debris. I do not suggest that backyards, even those shared by more than one tenant, may never be deemed private.

## III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the magistrate judge's recommendation (R. 20) is **ADOPTED**, and defendant's motion to suppress (R. 8) is **DENIED**.

Dated at Milwaukee, Wisconsin, this 21st day of November, 2011.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge